**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John RUPPEL, Defendant-Appellant.**

**No. 80–1962.**

United States Court of Appeals,
Fifth Circuit.*
Unit A

Jan. 25, 1982.

Rehearing and Rehearing En Banc
Denied March 2, 1982.

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Joseph M. Tipton, Robert W. Ritchie, Knoxville, Tenn., for defendant-appellant.

David P. Baugh, Asst. U. S. Atty., Beaumont, Tex., William C. Bryson, Deborah Watson, Attys., Dept. of Justice, Washington, D. C., for the U. S.

Before THORNBERRY, REAVLEY and POLITZ, Circuit Judges.

REAVLEY, Circuit Judge:

On May 1, 1979, the appellant, John Ruppel, was named along with twenty-three others[1] in a multi-count indictment returned in the United States District Court for the Eastern District of Texas. The indictment outlined a scheme in which Ruppel and his coconspirators imported approximately 147,000 pounds of marijuana from Colombia into Texas and arranged for its distribution throughout the United States. The conspiracy involved the purchase of four shrimping vessels: Monkey, Jubilee, Bayou Blues, and Agnes Pauline. Using these vessels, the conspirators arranged for five different shipments of marijuana to be brought from Colombia into Texas where it was unloaded into trucks and transported to various points for distribution.

The indictment charged Ruppel with conducting the affairs of an enterprise through a pattern of racketeering activity, *see* 18 U.S.C. § 1962(c), conspiracy to conduct the affairs of an enterprise through a pattern of racketeering activity, *see* 18 U.S.C. § 1962(d), and engaging in a continuing criminal enterprise, *see* 21 U.S.C. § 848. His first trial ended when the jury was unable to reach a unanimous verdict on any of the three counts lodged against him.[2]

1. For ease of identification throughout this opinion, we have referred to those indicted along with the appellant as "coconspirators" or "conspirators" even though all were not convicted of conspiracy and some had all charges against them dismissed. *See* note 2 *infra.*

2. Of the 24 persons named in the indictment, several decided to testify for the government in exchange for a favorable plea bargain. Five of these conspirators eventually succeeded in persuading the Government to dismiss all counts against them. Their story is told in *United States v. Butler*, 486 F.Supp. 1285 (E.D.Tex. 1980), *rev'd sub nom. United States v. Hamm*, 659 F.2d 624 (5th Cir. 1981) (en banc). Of those who stood trial alongside the appellant, most were convicted. For their appeal to this court see *United States v. Hawkins*, 658 F.2d 279 (5th Cir. 1981).

Subsequently, the grand jury named the appellant in a second indictment and charged him with conspiracy to violate the drug laws, *see* 21 U.S.C. § 846, and with four counts of possession of marijuana with intent to distribute, *see* 21 U.S.C. § 841. Both indictments were consolidated for trial and the Government dismissed the count charging Ruppel with conspiracy to conduct the affairs of an enterprise through a pattern of racketeering activity. The jury in the second trial was unable to reach a verdict on the count charging the appellant with conspiracy to violate the drug laws, but found him guilty as charged in the remaining counts in the indictments. After sentencing, however, the district judge, relying on *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), granted Ruppel a new trial because the Government had not disclosed at the second trial the terms of its plea agreements with several witnesses.

Ruppel was retried along with a recently surfaced coconspirator, Charles Elbert "Muscles" Foster. The jury in this, the third trial, found the appellant guilty of conspiracy to violate the drug laws and of three of the four counts of possession of marijuana with intent to distribute—all counts from the second indictment.

In his appeal to this court, Ruppel raises several issues:

1. Whether the second indictment against him should have been dismissed for prosecutorial vindictiveness?

2. Whether the Government misused the grand jury to obtain additional evidence against him after he already had been indicted?

3. Whether his trial should have been severed from the trial of codefendant Foster?

4. Whether coconspirator Hamm's testimony, relating to the appellant's knowledge of the purchase of the Monkey, was admissible in evidence?

5. Whether coconspirator Butler's testimony, that codefendant Foster said that he [Foster] and Ruppel would split the profits from the next shipment of marijuana, was admissible in evidence?

6. Whether tape recordings of several telephone calls made by coconspirator Butler were admissible in evidence?

7. Whether the district judge correctly instructed the jury on character evidence?

8. Whether the district judge, already having instructed the jury on the presumption of innocence at the outset of the trial, was required to repeat this instruction in his charge to the jury?

We consider these issues *seriatim* and affirm.

### 1. Prosecutorial Vindictiveness

The appellant's claim of prosecutorial vindictiveness is predicated on two decisions of the Supreme Court, *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974), and *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), which he claims establish that

> when the prosecution has occasion to reindict the accused because the accused has exercised some procedural right, the prosecution bears a heavy burden of proving that any increase in the severity of the alleged charges was not motivated by a vindictive motive.

*United States v. Ruesga-Martinez*, 534 F.2d 1367, 1369 (9th Cir. 1976) (footnote omitted). Ruppel contends that his decision to plead not guilty and stand trial on the counts contained in the initial indictment was the exercise of a procedural right—the right to a trial by jury—and that his due process rights were violated when the Government indicted him for additional crimes arising out of the same transactions upon which the first indictment was based. We disagree with the appellant's reading of *Pearce* and *Blackledge*.

The exercise of "some procedural right" by a defendant during his prosecution—such as electing to stand trial before a jury—is by itself insufficient to place on

the prosecutor the burden of demonstrating the absence of vindictiveness in his subsequent acts. The due process violation in cases such as *Pearce* and *Blackledge* does not arise from the possibility that a defendant might be deterred from exercising a procedural right. *Bordenkircher v. Hayes,* 434 U.S. 357, 363, 98 S.Ct. 663, 667, 54 L.Ed.2d 604 (1978). Rather, it stems from the danger that the Government might retaliate "against the accused for [some action] lawfully attacking his conviction." *Id.* (*Pearce* and *Blackledge* do not apply when a prosecutor carries out a threat to reindict on more serious charges if the accused does not plead guilty to the offense with which he was originally charged); *see, e.g., Jackson v. Walker,* 585 F.2d 139 (5th Cir. 1978) (*Pearce* and *Blackledge* apply when a defendant is successful on appeal in overturning his state criminal conviction); *Hardwick v. Doolittle,* 558 F.2d 292 (5th Cir. 1977) (*Pearce* and *Blackledge* apply when a state criminal defendant succeeds in setting aside his conviction through federal habeas corpus), *cert. denied,* 434 U.S. 1049, 98 S.Ct. 897, 54 L.Ed.2d 801 (1978); *Miracle v. Estelle,* 592 F.2d 1269 (5th Cir. 1979) (*Pearce* and *Blackledge* apply when trial court grants a defendant's motion for a new trial subsequent to a conviction). As explained by Dean Vorenberg,

> While the doctrine ... purports to prohibit retaliatory prosecution generally, it appears to be applied only where prosecutors have retaliated against specially protected actions by defendants, such as the exercise of first amendment rights or the right to appeal a conviction. Allowing the punishment of a defendant to be increased because he wishes to exercise his right to go to trial is considered to be pragmatically justified by the state's interest in efficient criminal administration, notwithstanding the burden placed on the exercise of the sixth amendment right to trial by jury.

Vorenberg, *Decent Restraint of Prosecutorial Power,* 94 Harv.L.Rev. 1521, 1541–42 (1981) (footnotes omitted).

■ We reject the appellant's claim of prosecutorial vindictiveness. Ruppel's first trial ended in a mistrial because the jury was unable to reach a verdict. Not only was there no conviction to attack, but a trial followed by a mistrial due to a hung jury presents different considerations than a conviction followed by a reversal. The mistrial follows as of course from the jury's inability to agree upon a verdict. Unlike an attack upon a conviction, a mistrial resulting from a hung jury does not result from any action taken by a defendant.

■ Absent evidence of actual retaliation, mere reindictment after a mistrial due to a hung jury is insufficient to demonstrate the realistic likelihood of prosecutorial vindictiveness to which *Pearce* and *Blackledge* apply.[3] As Ruppel's claim of prosecutorial vindictiveness is based solely on a reindictment following a hung jury, it is without merit.

### 2. *Grand Jury Misuse*

We likewise find no merit in the appellant's claim that the Government misused the grand jury when it called convicted coconspirator Jamie Holland before the grand jury on April 3 and 4, 1980, and questioned him about the marijuana smuggling operation.

■ The law is well settled in this circuit that while the Government may not use the

---

**3.** We recognize that at least two United States courts of appeals have applied *Pearce* and *Blackledge* to prevent the Government from adding additional charges against a federal criminal defendant after he has elected a trial by jury prior to a conviction. *See United States v. Goodwin,* 637 F.2d 250 (4th Cir. 1981), *petition for cert. granted,* —— U.S. ——, 102 S.Ct. ——, 70 L.Ed.2d —— (U.S. Nov. 30, 1981) (No. 80–2195); *United States v. Ruesga-Martinez,* 534 F.2d 1367 (9th Cir. 1976).

We believe, however, that the rationale of the Ninth Circuit in *Ruesga-Martinez* has been substantially undermined by the Supreme Court's decision in *Bordenkircher v. Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). We also are of the opinion that the decision of the Fourth Circuit in *Goodwin* may not be squared with the Supreme Court's teachings in *Bordenkircher.* Accordingly, we expressly decline to follow either of these decisions.

grand jury in place of discovery for the purpose of preparing a pending indictment for trial, it may continue with an investigation. *E.g., United States v. Beasley*, 550 F.2d 261, 266 (5th Cir.), *cert. denied*, 434 U.S. 863, 938, 98 S.Ct. 195, 427, 54 L.Ed.2d 138, 297 (1977); *Beverly v. United States*, 468 F.2d 732, 743 (5th Cir. 1972). Ruppel contends that the Government's interrogation of Holland before the grand jury was not in furtherance of the Government's ongoing investigation into marijuana smuggling, but "dealt . . . with matters exclusively relating to pending charges."

■ We have reviewed Holland's grand jury testimony and conclude that the Government did not misuse the grand jury when it summoned Holland for questioning. Even a cursory examination of the transcript of the proceedings shows the Government was continuing with its investigation into marijuana smuggling from Colombia into the United States. Questions were asked of Holland about individuals known only by nickname and not yet named in any indictment. *Cf. Beverly*, 468 F.2d at 743 ("A proper purpose for subpoenaing appellants would be to inquire of them as to the surrounding circumstances with a view to discovery of the identity of the alleged 'unknown persons' [mentioned in the indictment]."). To be sure, the Government may have benefitted incidentally from Holland's grand jury testimony as he reviewed his participation in the conspiracy. But, in light of the presumption that the grand jury and the prosecutor have properly performed their duties, *Beverly*, 468 F.2d at 743, we cannot say that this use of the grand jury in furtherance of a continuing criminal investigation was improper. Moreover, as Holland was brought before the grand jury subsequent to Ruppel's conviction at his second trial, and before the judge had granted a new trial, we cannot surmise that the Government was using the grand jury to prepare for a then unexpected third trial.[4]

---

4. On March 14, 1980, the district judge entered a judgment convicting the appellant after his second trial. Holland was called before the grand jury on April 3 and 4, 1980. The appellant's motion for a new trial was not granted until April 18, 1980—nearly 2 weeks after Holland appeared before the grand jury.

### 3. *Severance*

Ruppel contends that the district judge should have severed his trial from that of codefendant Charles Foster. He claims that had his severance motion been granted and the Government tried Foster initially, Foster would have been available to testify that the participants in the marijuana smuggling operation intentionally withheld from him information regarding criminal activities—specifically, any information that the Monkey was being used criminally.

■ We often have emphasized that a motion for severance is directed to the sound discretion of the district judge, *see, e.g., United States v. Hawkins*, 661 F.2d 436, 457 (5th Cir. 1981); *United States v. Horton*, 646 F.2d 181, 187 (5th Cir. 1981), and that we are reluctant to second guess a trial judge's refusal to grant a severance, *see, e.g., Hawkins*, 661 F.2d at 457; *United States v. Marino*, 617 F.2d 76, 83 (5th Cir.), *cert. denied*, 449 U.S. 1015, 101 S.Ct. 575, 66 L.Ed.2d 474 (1980). To qualify for a severance in order to obtain the testimony of a codefendant, a criminal defendant must show: "(1) a bona fide need for the testimony; (2) the substance of the testimony; (3) its exculpatory nature and effect; and (4) that the co-defendant will in fact testify if the cases are severed." *United States v. Butler*, 611 F.2d 1066, 1071 (5th Cir.), *cert. denied*, 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980). The district judge should grant a severance only if the defendant also demonstrates that he is unable to obtain a fair trial without the severance and any compelling prejudice that results cannot be alleviated at trial. *United States v. Horton*, 646 F.2d 181, 186 (5th Cir. 1981); *United States v. Crawford*, 581 F.2d 489, 491 (5th Cir. 1978).

■ There was no indication that Foster would "in fact testify if the cases [were] severed." Indeed, in support of his motion

Ruppel argued that if a severance were granted Foster "would more likely testify" at his subsequent trial. We have, however, recently rejected this precise assumption as establishing grounds for a severance. *See United States v. Grapp*, 653 F.2d 189, 193 (5th Cir. 1981).

Moreover, the appellant did not have a bona fide need for codefendant Foster's testimony. Ruppel anticipated that Foster would relate how the other participants in the smuggling operation did not permit him to know that their venture was illegal. Similar testimony, however, was presented by at least one coconspirator, Jamie Holland. Another coconspirator, Martin Sneed, indicated that he was unaware Ruppel even was involved in the operation. Thus, Foster's testimony would have served "merely [to] duplicate[ ] other evidence" and, accordingly, did not justify a severance. *See United States v. Metz*, 608 F.2d 147, 156 (5th Cir. 1979), *cert. denied*, 449 U.S. 821, 101 S.Ct. 80, 66 L.Ed.2d 24 (1980).

### 4. *Hamm's Testimony*

As part of the Government's case-in-chief, Robert Hamm, another coconspirator in the marijuana smuggling operation, related on direct examination Ruppel's involvement in the purchase of the shrimping vessel Monkey. Ruppel's counsel, Robert Ritchie, followed on cross-examination by taking Hamm through a series of questions designed to show the jury that while the appellant was involved in the purchase of the Monkey, Ruppel's involvement was, as far as Hamm knew, intended by Ruppel to be a legitimate business venture. The cross-examination culminated:

RITCHIE: And you did not know that John Ruppel was in the business—you didn't know, did you, when he came down to Aransas Pass—you didn't know whether this man knew anything about it or not, did you?

HAMM: No, sir.

RITCHIE: You didn't know whether or not he was knowledgeable about the marijuana business at all, did you?

HAMM: No, sir.

RITCHIE: And you didn't know it to this day, do you, Mr. Hamm?

HAMM: No, sir.

On redirect the Government sought to dispel the impression from Hamm that Ruppel was unaware of the purpose to which the shrimping vessel would be put. David Baugh, the prosecutor, asked:

BAUGH: At anytime during the meeting did you think that Mr. Ruppel didn't know what you were doing?

HAMM: No, sir.

The appellant contends that this testimony is inadmissible.

The starting point of our analysis of the admissibility of this testimony is that the ultimate decision on admissibility rests in the hands of the trial judge, whose exercise of discretion will be upset only for clear abuse. *Scheib v. Williams-McWilliams Co.*, 628 F.2d 509, 511 (5th Cir. 1980). The district judge admitted Hamm's testimony because Hamm's thoughts on Ruppel's involvement in the purchase of the Monkey and its use as a vessel to transport marijuana from Colombia had been "opened up" by Ruppel's counsel on cross-examination.

An inquiry about facts known by the witness' own observation does not open the door to cross-inquiry about conclusions gleaned from the witness' appraisal of circumstances. It is for the jury to draw conclusions from those facts known to the witness and accepted as true by the jury. This is particularly so of that conclusion on intention or state of mind of the appellant.

Defense counsel asked the prosecution witness, Hamm, if the conversation with the appellant included any reference to marijuana. He was entitled to ask, with impunity, if Hamm had personal knowledge of what facts were known to Ruppel. Hamm understood that to be what he was being asked, and his response was therefore in the negative.

On the other hand, counsel may not mislead the jury or convey an erroneous impression without opening the avenue for cross-interrogation for purposes of clarification. *See United States v. Fairchild*, 505

F.2d 1378, 1383 (5th Cir. 1975); *United States v. Paquet*, 484 F.2d 208, 211 (5th Cir. 1973). Whether intentional or not, the three questions put to Hamm conveyed the impression that this actor in the conspiracy did not think at any time that Ruppel knew the vessels were handling marijuana instead of shrimp. The prosecution clarified the point by eliciting a mere "No, sir" in response to the inquiry whether Hamm was saying that he thought at the time of the meeting that Ruppel did not know "what you were doing."

The admission of opinion testimony about a defendant's state of mind is highly prejudicial and must be avoided. If, on voir dire either in or out of the hearing of the jury, the witness, Hamm, had testified that his impression came solely from hearsay rather than from his observation of the defendant, his opinion or thought on the subject would have been subject to motion to strike. Nevertheless, under the circumstances, we find no error in admitting the answer to the prosecutor's question.

### 5. *Butler's Testimony*

During the trial, Butler testified extensively about an August 1978 meeting held at the DFW Airport's Marina Hotel that included Ruppel, Holland, Foster, and himself. It was at this meeting that the conspirators first laid their plans for the shipment of marijuana on the Agnes Pauline. Butler testified that as part of his increased involvement in the marijuana smuggling operation he was to assist in the purchase and outfitting of another boat. The participants at the meeting discussed the purchase of a boat capable of hauling marijuana. Butler recounted that because some concern

had developed that several conspirators under Foster's supervision had not been paid for their assistance in prior smuggling operations, the conversation turned to who was receiving how much money from the next load. According to Butler, during this discussion, and in Ruppel's presence, "[Foster] said John R. and himself would split what was left after everything was paid." Butler concluded his review of the meeting at the Marina Hotel by testifying that Ruppel gave Foster $20,000 during the meeting.

Ruppel contends that the admission of this testimony, including Foster's statement that he and Ruppel were splitting "what was left after everything was paid," was hearsay testimony that violated his Sixth Amendment right to confront the witness against him. We see no problem with this evidence.

Butler's testimony was admitted to show that there had been a meeting of the conspirators attended by the appellant where the nature of the venture and Ruppel's intent were expressly addressed. Standing alone, Foster's statement that he and Ruppel would be splitting the profits would constitute hearsay if Ruppel had not been present at the meeting. Here, however, Butler testified to Ruppel's personal participation in the meeting and to talk that itself established the anticipation if not implied agreement that Ruppel would profit from the venture. We need not reach the law on admissions by silence or the Sixth Amendment right of confrontation.[5]

### 6. *Tape Recordings of Telephone Calls*

As part of its case, the Government offered a tape recording made by coconspira-

---

5. We need not decide whether the admission of coconspirator Washington's testimony that Butler had told him "it was [Holland's and Foster's] boat load. They got the money from [Ruppel. Ruppel] takes his part back off the top and then splits it with them" and "[Foster, Ruppel, and Holland] split the profit," requires a reversal. Because this testimony was substantially the same as Butler's own testimony—indicating that Ruppel had a significant financial interest in the next shipment of marijuana—even if these statements were inadmis-

sible post-arrest utterances not made during the course of the conspiracy, *see United States v. Postal*, 589 F.2d 862, 888 (5th Cir.), *cert. denied*, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979), they are, as conceded in the appellant's brief "merely a recital of Charles Foster's . . . assertion that he and [Ruppel] were to 'split what was left after everything was paid.'" Accordingly, Washington's testimony added nothing, and its reception in evidence was harmless.

tor Butler of several post-arrest telephone calls that he made to Ruppel, Holland, and others in Tennessee.[6] Because parts of several of the telephone conversations on the tape were difficult to hear, the Government also offered a transcript of each of the calls so that the court and the jurors might understand more easily the tape as it was played.

Over the objections of Ruppel's counsel, the district judge admitted the tape and the Government's transcript. A transcript prepared by counsel for Ruppel also was admitted in evidence. The judge concluded that the purpose behind recording the telephone conversations was not to violate a federal or state criminal statute, that the conversations between Butler and Ruppel were admissible as admissions, and that the other conversations on the tape possessed such circumstantial guarantees of trustworthiness as not to be excluded by the hearsay rule. With one exception, we disagree with the appellant's objections to the tape and transcripts.

Federal law excludes from evidence the contents of a recorded telephone conversation when the recording is made "for the purpose of committing [a] criminal . . . act in violation of the . . . laws of the United States or of any State." 18 U.S.C. §§ 2511, 2515. Ruppel contends that the recording was made so that law enforcement agencies could be furnished with evidence of his involvement in the marijuana smuggling operation if he refused Butler's demands for money and that this conduct constituted blackmail and extortion.[7] This contention was rejected by the district judge. After a hearing, he found that "the purpose for making the phone calls to Mr. Holland and Mr. Ruppel was to somehow enhance the witness's position as far as plea bargaining is concerned," and that the federal statute prohibiting interception of a

wire communication for the purpose of committing a criminal act had not been violated. The district judge's finding was based on the plausible testimony of Butler, the person who had initiated the telephone calls. The burden was on Ruppel to demonstrate that Butler's recording of the conversations was unlawful. *See United States v. Phillips*, 540 F.2d 319, 325–26 (8th Cir.), *cert. denied*, 429 U.S. 1000, 97 S.Ct. 530, 50 L.Ed.2d 611 (1976). Our review of the record does not show that this burden was discharged. As a result, the district judge was not clearly erroneous when he found no violation of federal or state law.

The appellant next challenges the admission of the taped conversations between Butler and Holland. The district judge admitted these conversations as an exception to the hearsay rule because he found they contained "sufficient circumstantial guarantees of trustworthiness." *See* Fed.R. Evid. 803(24).

We agree with the appellant that the two telephone conversations between Butler and Holland should not have been admitted in evidence. The record reveals only that Butler twice called Holland: once to arrange a face-to-face meeting, another time to discuss how Foster had disappeared without reimbursing several of the participants for their expenses from the marijuana smuggling operations. Without more, there was nothing intrinsic in the circumstances surrounding either of these telephone conversations which would provide a guarantee of trustworthiness equivalent to the exceptions to the hearsay rule. *See, e.g., Dallas County v. Commercial Union Assurance Co.*, 286 F.2d 388 (5th Cir. 1961) (newspaper article describing fire during construction of courthouse admitted in evidence as possessing equivalent guarantees of trustworthiness as found in exceptions to hearsay rule).

---

6. Butler recorded six telephone conversations onto a single tape. The parties to the calls were as follows:

No. 1 Butler and Operator,
No. 2 Butler and Holland,
No. 3 Butler, Operator, and Triangle Bonding,

No. 4 Butler and Ruppel,
No. 5 Butler and Holland; Butler and Ruppel, and
No. 6 Butler and Two Operators.

7. *See* 18 U.S.C. § 873 (blackmail); 18 U.S.C. § 875(d) (extortion).

Nonetheless, we conclude that the admission in evidence of the telephone conversations between Butler and Holland was harmless and did not prejudice the appellant at his trial. At most, the conversations indicated that Ruppel was a participant in the financing of the marijuana smuggled on the Agnes Pauline. Evidence of the appellant's involvement with the Agnes Pauline shipment, however, was introduced both through the recorded telephone conversations between Butler and Ruppel and through Butler's prior testimony of Ruppel's involvement with other conspirators in the planning and financing of the shipment of marijuana during the meeting at the DFW Airport's Marina Hotel. Thus, although inadmissible, the contents of the two Butler-Holland telephone conversations duplicated other admissible evidence showing Ruppel's involvement in the conspiracy and, as such, was harmless in that it added nothing to the Government's case against him.

We do not agree with the appellant's contention that portions of the taped conversations between Butler and Holland and between Butler and Ruppel are so inaudible that the entire conversation should not have been admitted. "Tape recordings which are only partially intelligible are admissible unless those portions are so substantial as to render the recording as a whole untrustworthy." *United States v. Llinas*, 603 F.2d 506, 508 (5th Cir. 1979), *cert. denied*, 444 U.S. 1079, 100 S.Ct. 1030, 62 L.Ed.2d 762 (1980); *accord, United States v. Greenfield*, 574 F.2d 305, 307 (5th Cir.), *cert. denied*, 439 U.S. 860, 99 S.Ct. 178, 58 L.Ed.2d 168 (1978). This determination is left to the sound discretion of the judge, *Llinas*, 603 F.2d at 508; *Greenfield*, 574 F.2d at 307, and, in light of the lengthy hearing on admissibility and the precautions taken by the trial court when the tape was played, we find no abuse of discretion.

Likewise, the district judge did not abuse his discretion when he allowed the jury to follow a Government-prepared transcript as it listened to the tape. We previously have held that a transcript of a tape recorded conversation is admissible to aid the jurors' hearing of the tape. *United States v. Rochan*, 563 F.2d 1246, 1250 (5th Cir. 1977); *see Greenfield*, 574 F.2d at 307. The procedures we set out in *United States v. Onori*, 535 F.2d 938, 948–49 (5th Cir. 1976), were followed by the district judge. Counsel for Ruppel was unable to agree with the Government's version of the tapes, so both parties prepared and introduced transcripts. The jury properly was cautioned in advance that

> the transcription is available for your assistance only. You will be governed by what you hear in the tape.... If what you hear differs from what's on the transcription, you'll be governed by what you hear.

Immediately before the tape was played, the jury was again cautioned by the district judge,

> You are specifically instructed, however, that whether the transcript correctly or incorrectly reflects the contents of the conversation or the identity of the speakers is entirely for you to determine based upon your own evaluation of the testimony that you've heard concerning the transcript, and from your own examination of the transcript in relation to your hearing of the tape recording itself as the primary evidence of its contents. In other words, the tape recording is the primary evidence of the contents, and the transcript is to assist you in evaluating the primary evidence. If you determine that the transcript is in any respect incorrect, then you should disregard it to that extent. Disregard—if you cannot determine from the tape that particular words were spoken, you will disregard the transcript insofar as those particular words are concerned.

### 7. & 8. *Instructions to the Jury*

Ruppel raises two issues with respect to the district judge's instructions to the jury at the close of the trial. First, the appellant claims that the instruction on character evidence both created the impression that character evidence alone may not give rise

to a reasonable doubt and discounted the significance of his character evidence.[8] The judge charged:

> You will recall that [Defendant Ruppel] introduced evidence tending to establish his good reputation for truth and voracity [sic] and general character in the community. The evidence may indicate to you that it's improbable that a person of such good character would commit the crimes charged. However, such evidence does not preclude the Defendant from being so involved. You should consider this evidence along with all the other evidence in the case in determining the guilt or innocence of the Defendant for you are the sole and exclusive judges of the facts in the case and the weight and credibility to give all the evidence in the case.

There is, of course, no ritualistic incantation or magic formula that the judge must recite in his charge on character evidence. The rule in this circuit is that, when presented, evidence of "good character should be considered together with all other evidence in a case and may itself give rise to a reasonable doubt." *See United States v. Callahan*, 588 F.2d 1078, 1085 (5th Cir.), *cert. denied*, 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979). So long as the charge correctly states the law to the jury it matters not what words the judge chooses to employ. *Kayo Oil Co. v. Sammans*, 321 F.2d 729, 730 (5th Cir. 1963).

The instruction given by the judge correctly expresses the law of this circuit. The jury was told that they should "consider [character] evidence along with all other evidence ... in determining the guilt or innocence of the Defendant." Inasmuch as the ultimate determination of the accused's "guilt or innocence" is similar to a finding of "reasonable doubt," we cannot say that the charge did not convey the proper instruction to the jury. We previously have approved an instruction that similarly substituted the phrase "along with all [the] other evidence" and did not stress that "character evidence standing alone is sufficient to raise a reasonable doubt." *See United States v. Fontenot*, 483 F.2d 315, 323 (5th Cir. 1973). Nor can the appellant complain that the judge told the jury that "[character] evidence does not preclude the Defendant from being ... involved" in criminal activity since that instruction is a correct statement of the law.

To be sure, had the district judge submitted the previously approved jury instruction on character evidence drafted by the Fifth Circuit District Judge's Association,[9] and requested by the appellant, this much of our opinion would be unnecessary. *Callahan*, 588 F.2d at 1086. Nonetheless, so long as the charge accurately reflects the law and the facts, the district judge is vest-

---

8. Counsel for the appellant did not object to the district judge's instruction on character evidence after the jury retired and, absent plain error, would be precluded from contesting the instruction in this court. *See* Fed.R.Crim.P. 30. It is clear from the dialogue between the court and counsel, however, that the judge had considered fully the appellant's requested instruction on character evidence during a prior conference at which the proposed charge of the court was discussed. The instruction also had been filed in advance with the district court and is part of the record on appeal. Moreover, because it was the apparent intention of the district judge to allow counsel for the appellant an objection when the charge did not conform substantially to his requested instructions, we consider the appellant's argument concerning the instruction on character evidence. *See United States v. Davis*, 583 F.2d 190, 194–95 (5th Cir. 1978); *see also* 2 C. Wright, Federal Practice and Procedure § 484, at 288–90 (1969).

9. Where a Defendant has offered evidence of good general reputation for truth and veracity, or honesty and integrity, or as a law-abiding citizen, the jury should consider such evidence along with all the other evidence in the case.

Evidence of a Defendant's reputation, inconsistent with those traits of character ordinarily involved in the commission of the crime charged, may give rise to a reasonable doubt, since the jury may think it improbable that a person of good character in respect to those traits would commit such a crime.

The jury will always bear in mind, however, that a law never imposes upon a Defendant in a criminal case the burden or duty of calling any witness or producing any evidence.

U.S. Fifth Circuit District Judges Association, Pattern Jury Instructions—Criminal Cases 37 (1979).

ed with broad discretion in formulating his charge, E. Devitt & C. Blackmar, Federal Jury Practice and Instructions § 7.01, at 198 (1977), and we will not lightly disturb his judgment.

■ The appellant's other objection to the court's charge is far more serious. In the face of clear and unmistakable authority that a federal trial judge in this circuit instruct the jury on the presumption of innocence at the close of the case, see United States v. Fernandez, 496 F.2d 1294, 1299 (5th Cir. 1974); United States v. Davila-Nater, 474 F.2d 270, 285 (5th Cir. 1973), the district judge chose only to instruct the jury to "recall" "some general definitions and instructions," including the presumption of innocence, given at the outset of the trial.[10] While we approve Judge Parker's decision to follow the better practice of instructing the jury on the fundamentals of a criminal trial prior to taking any evidence, see ABA Advisory Committee on the Criminal Trial, Trial by Jury § 4.6(d) (1968), his subsequent failure to repeat those instructions with the remainder of his charge at the close of the trial—11 days later—cannot be approved.

> The presumption of innocence is one of the fundamentals of the law. It is not to be minimized or denied to any one accused of crime.... One accused of crime has the right to have the jury take it to the jury room with them as the voice of the law.

Merrill v. United States, 338 F.2d 763, 768 (5th Cir. 1964) (quoting Dodson v. United States, 23 F.2d 401, 403 (4th Cir. 1928)).

■ Ideally, once the jury is sworn and the trial has begun, the trial judge should explain to the jurors their function as judges of the facts, the presumption of innocence, the burden of reasonable doubt, the roles of the judge and the lawyers, and other preliminary matters that are necessary to guide them through the trial. See ABA Advisory Committee on the Criminal Trial, Trial by Jury 116–18 (1968). When both sides have rested and have completed their arguments to the jury, the district judge must repeat the initial instructions as part of the court's charge at least insofar as they involve definitions of criminal offenses and the rules of evidence.

> Even if certain instructions are given after the jury is sworn, it will nonetheless be necessary for the jury to be instructed before they retire. The instructions given at this time will include at least some of the instructions which were given when the trial opened.

Id. at 117–18; see also 8A Moore's Federal Practice ¶ 30.02, at 30–5 (2d ed. 1981) ("instructions of importance delivered during the trial would necessarily be repeated in the court's charge").

■ Although the district judge erred by failing to instruct the jury on the presumption of innocence at the close of the trial, a new trial is not required.

> [T]he failure to give a requested instruction on the presumption of innocence .... must be evaluated in light of the totality of the circumstances—including the instructions to the jury, the arguments of counsel, whether the weight of evidence was overwhelming, and other relevant factors.

Kentucky v. Whorton, 441 U.S. 786, 789, 99 S.Ct. 2088, 2090, 60 L.Ed.2d 640 (1979). The district judge charged the jury on the presumption of innocence at the beginning of the trial and referred to these instructions at the outset of his final charge. Appellant's counsel referred to the presumption of innocence during his closing argument. Given this background, we are unwilling to believe that the jury retired to deliberate

---

10. Specifically, the jury was charged,

You recall at the first of the case I gave you some general definitions and instructions. I'm not going to repeat those, but simply ask you to recall them. Specifically, I ask you to recall the definitions on direct and circum-

stantial evidence, the presumption of innocence, a Defendant's right not to take the stand, if a Defendant so chooses, and the Defendant's right to require the Government to prove each and every element of its case beyond a reasonable doubt.

less than fully aware of the presumption of innocence.[11]

AFFIRMED.

---

11. The appellant also has argued that the evidence presented by the Government is insufficient to support his convictions. We have reviewed the record. In light of Hamm's testimony that the appellant met with him to discuss the purchase of a shrimping vessel, the Monkey, Butler's testimony that the appellant met with him and Holland and Foster at the DFW Airport's Marina Hotel to discuss the purchase of another shrimping vessel to transport marijuana, and the contents of tapes of Butler's post-arrest telephone calls to Ruppel, we do not think that a reasonably minded jury must have entertained a reasonable doubt about the appellant's guilt. *See United States v. Cardona,* 650 F.2d 54, 57 (5th Cir. 1981).

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452–October 14, 1980.